UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.H., et al., | No. 1:19-cv-00435-DAD-EPG |
| Plaintiffs, | |
| v. | ORDER GRANTING DEFENDANT'S MOTION TO DISMISS |
| UNITED STATES OF AMERICA, | (Doc. No. 15) |
| Defendant. | |

This matter came before the court on defendant United States of America's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. (Doc. No. 15.) A hearing on the motion was held on November 19, 2019.[1] Attorney Kevin Kalajian appeared telephonically on behalf of plaintiffs Noe Hurtado, Karla Monserrat Diaz Hernandez, C.H., and F.H. Assistant United States Attorney Joseph Frueh appeared telephonically on behalf of the government. Having reviewed the parties' briefing and heard oral argument, and for the reasons set forth below, the court will grant defendant's motion to dismiss.

/////

---

[1] The undersigned apologizes for the excessive delay in the issuance of this order. This court's overwhelming caseload has been well publicized and the long-standing lack of judicial resources in this district has reached crisis proportion. Unfortunately, that situation sometimes results in the court not being able to issue orders in submitted civil matters within an acceptable period of time. This situation is frustrating to the court, which fully realizes how incredibly frustrating it is to the parties and their counsel.

1

**BACKGROUND**

Plaintiffs' complaint alleges the following. Plaintiffs are citizens and residents of Mexico. (Doc. No. 1 ("Compl.") at ¶ 6.) Plaintiffs Hurtado and Hernandez are the parents of C.H. and F.H. (*Id.* at ¶ 7.) On September 3, 2017, the family vacationed in the United States, visiting Yosemite National Park ("Yosemite"). (*Id.* at ¶¶ 7, 9.) At all times, Yosemite was owned, operated, managed and to be maintained by defendant United States of America through the National Park Service ("NPS"). (*Id.* at ¶ 10.)

While attempting to exit the park via California State Route 120, plaintiffs had to stop their car on Big Oak Flat Road because a tree branch had blocked the road. (*Id.* at ¶ 11.) Plaintiff Hurtado exited the vehicle to move the branch. (*Id.*) As he was returning to the vehicle, plaintiff Hurtado witnessed a tree (the "Subject Tree") fall onto the vehicle in which the rest of the plaintiffs had remained. (*Id.*) Plaintiffs Hernandez, C.H., and F.H. were all injured as a result. (*Id.*) While awaiting emergency response, plaintiff Hurtado and bystanders removed C.H. from the vehicle, but plaintiffs Hernandez and F.H. remained trapped inside and could not be removed without moving the vehicle from under the tree. (*Id.* at ¶ 12.) Once bystanders moved the tree and plaintiff Hernandez was removed from the vehicle, one bystander gave her rescue breath. (*Id.*) F.H. remained pinned in the vehicle. (*Id.*) Eventually, plaintiff Hernandez and F.H. were airlifted to the hospital for treatment. (*Id.*)

Plaintiffs allege that as a direct, legal, and proximate result of the government's acts and omissions, plaintiffs Hernandez, C.H., and F.H. suffered significant economic and non-economic damages, including but not limited to ongoing medical expenses, physical pain and suffering, emotional distress, disability, and lost wages. (*Id.* at ¶ 14.) Plaintiff Hurtado suffered emotional distress; economic and non-economic damages; and loss of support, services, love, companionship, affection, society, and other elements of consortium. (*Id.*) Plaintiffs believe and allege that the Subject Tree was one of a group of many trees left "standing dead" in that area of the National Park, and that immediately following this failure of the Subject Tree, NPS employees removed numerous nearby trees that they had determined to be hazardous. (*Id.* at

/////

¶ 16.) According to plaintiffs, the government, through NPS, negligently maintained the park premises and the Subject Tree. (*Id.* at ¶ 22.)

On April 4, 2019, plaintiffs filed this complaint alleging one cause of action: negligence for premises liability pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1). (Compl.) On October 1, 2019, the government filed the present motion to dismiss for lack of subject matter jurisdiction. (Doc. No. 15.) On October 22, 2019, plaintiffs filed their opposition, and on November 7, 2019, the government replied thereto. (Doc. Nos. 17, 19.)

**LEGAL STANDARD**

A party may move to dismiss a case for a lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Because of this, "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (internal citations omitted).

Challenges to jurisdiction may be either facial or factual in nature. *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*, 905 F. Supp. 2d 1158, 1167 (E.D. Cal. 2012). A facial attack to jurisdiction "accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)). On the other hand, a factual attack "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.* In a factual challenge, the court "is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

/////
/////
/////
/////
/////

3

**ANALYSIS**

The government moves to dismiss plaintiffs' complaint in its entirety, arguing that plaintiffs' claim falls within the discretionary function exception to the FTCA.[2] "As a sovereign, the United States is immune from suit unless it waives such immunity." *Chadd v. United States*, 794 F.3d 1104, 1108 (9th Cir. 2015) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). The waiver of sovereign immunity is a prerequisite to federal court jurisdiction. *Tobar v. United States*, 639 F.3d 1191, 1195 (9th Cir. 2011); *see also United States v. Mitchell*, 445 U.S. 535, 538 (1980). The FTCA waives the government's sovereign immunity for tort claims arising out of negligent conduct of government employees acting within the scope of their employment. *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008); *see also United States v. Sherwood*, 312 U.S. 584, 586 (1941). Pursuant to the FTCA, the United States can thus be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *Chadd*, 494 F.3d at 1109.

The FTCA, however, provides various exceptions to this broad waiver of sovereign immunity. One such carve-out is the discretionary function exception, which provides immunity from suit for "[a]ny claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The exception is designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Chadd*, 794 F.3d at 1108 (citing *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*), 467 U.S. 797 (1984)). "The government bears the burden of proving that the discretionary function exception applies." *Myers v. United States*, 652 F.3d 1021, 1028 (9th Cir. 2011).

---

[2] The tragic events which took place in Yosemite giving rise to this action have obviously had a devastating impact on the lives of the plaintiffs. Despite that devastating impact, however, the issue before this court is whether the United States is immune from suit in this instance, thereby depriving this court of subject matter jurisdiction over the action.

In *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988), the Supreme Court established a two-step test for determining the applicability of the discretionary function exception. Under that test, this court must first consider whether the challenged conduct is "discretionary in nature," that is, whether the actions "involve an 'element of judgment or choice.'" *Terbush*, 516 F.3d at 1129 (quoting *United States v. Gaubert*, 499 U.S. 315, 327 (1991)); *see also Berkovitz*, 486 U.S. at 536 (noting that the focus is on the nature of the conduct rather than the status of the actor). The discretionary function exception will not apply if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "there can be no element of discretion when an employee has no rightful option but to adhere to the directive." *Terbush*, 516 F.3d at 1129; *see also Berkovitz*, 486 U.S. at 536. If the *Berkovitz* test is satisfied at step one, the analysis proceeds to the second step, at which the court must determine whether the discretion left to the government "is of the kind that the discretionary function exception was designed to shield," that is, discretion rooted in "considerations of public policy." *Bailey v. United States*, 623 F.3d 855, 860 (9th Cir. 2010); *see also Myers*, 652 F.3d at 1028. Ultimately, if the challenged act or omission satisfies the two steps of the *Berkovitz* test, the government is immune from suit based on that act or omission, and federal courts lack subject matter jurisdiction over the action. *Bailey*, 623 F.3d at 860. This immunity exists even if the act or omission in question constituted an abuse of discretion or was the wrong choice under the circumstances. *See* 28 U.S.C. § 2680(a); *Terbush*, 516 3d. at 1129 ("Even if the decision is an abuse of the discretion granted, the exception will apply.")

As discussed below, applying the two-part test set out in *Berkovitz*, the court must conclude that the discretionary function exception precludes plaintiffs' claim for alleged negligent premises maintenance against the United States.

**A.   NPS Tree Policies are Discretionary in Nature.**

The government argues that plaintiffs' claim is barred by the discretionary function exception because NPS tree management policies are discretionary in nature. (Doc. No. 15-1 at 11–12.) "Whether a challenged action falls within the discretionary function exception requires a particularized analysis of the specific agency action challenged." *Young v. United States*, 769

1    F.3d 1047, 1053 (9th Cir. 2014) (citing *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174

2    (9th Cir. 2002)).  "Therefore, the Court must identify the challenged agency action before it may

3    determine whether that conduct involved 'an element of judgment or choice.'"  *Kim v. United*

4    *States* ("*Kim I*"), No. 1:16-cv-01656-LJO-SKO, 2017 WL 2619129, at *6 (E.D. Cal. June 16,

5    2017).

6        Here, plaintiffs' complaint alleges that the government negligently maintained the park

7    "as to cause or permit the said area to be in a dangerous, defective, unsafe and hazardous

8    condition, thereby causing a large tree to fall into the roadway and proximately cause their

9    injuries." (Compl. at ¶ 22.)  Plaintiffs' complaint alleges that "federal regulations specifically

10   require the NPS to inspect and maintain trees near public roadways," (*id.* at ¶ 23), and plaintiffs'

11   opposition brief specifies that in this instance the government failed to comply with Yosemite

12   National Park Directive No. 25, the Hazard Tree Management Plan (Doc. No. 17 at 4–5).

13   Plaintiffs also alleges that prior to the day of the incident, the government's "employees had

14   knowledge of trees 'standing dead' within Yosemite, that dead trees pose a heightened hazard risk

15   near roadways and other targets, and that the National Park Service has no discretion with respect

16   to removing trees that are 'standing dead.'"  (Compl. at ¶ 20.)

17       Policies concerning tree hazard management in Yosemite come in three different forms:

18   federal statutes, NPS-promulgated policies, and Yosemite Annual Work plans.  The authority of

19   the NPS to manage national parks is generally outlined in the Organic Act, 54 U.S.C. § 100101(a)

20   (amending and replacing 16 U.S.C. § 1 (repealed 2014)), which grants the NPS a broad mandate

21   "to conserve the scenery and the natural and historic objects and the wild life therein and to

22   provide for the enjoyment of the same in such manner and by such means as will leave them

23   unimpaired for the enjoyment of future generations."  The Act also authorizes the Secretary of the

24   Interior to "provide for the destruction of such animals and plant life as may be detrimental to the

25   use of any System unit."  *Id.* § 100752.  However, the statute does not articulate specific methods

26   for implementing these broad mandates, but rather sets out only a general framework for national

27   park management.  Pursuant to federal statutory grants of authority, the NPS "[has] discretion to

28   design and implement a policy for evaluating and removing trees."  *Autery v. United States*, 992

F.2d 1523, 1528 (11th Cir. 1993) (finding that the Organic Act gave the NPS discretion to design and implement a policy for evaluating and removing trees from national parks); *see also Kobi v. United States*, No. 1:15-cv-00478-DAD-BAM, 2016 WL 6599748, at *5 n.4 (E.D. Cal. Nov. 7, 2016) (reciting the facts of cases illustrating NPS's broad discretion).

In its pending motion to dismiss, the government submits various NPS policies and guidelines, including the NPS Management Policies, the Pacific West Region Directive PWR-062, Yosemite National Park Directive No. 25, the Yosemite Vegetation Management Plan, and the 1993 Guidelines for Managing Hazardous Trees. (Doc. Nos. 15-3, 15-4, 15-5, 15-6, 15-7.) Attached to the government's motion is the declaration of Brian S. Mattos, the Park Forester at Yosemite during the time of the incident in question. (Doc. No. 15-2 at ¶ 1–2.) Declarant Mattos contends that he coordinated the tree-hazard management program at the park and describes Directive No. 25 as "a framework for a hazard tree program" that states that the "park superintendent retains discretion to administer the program with available park staff and financial resources in the context of other legal requirements and other considerations." (*Id.* at ¶ 22.) Accordingly, the government argues that plaintiffs cannot identify any mandatory and specific statute or regulation requiring the removal of "standing dead trees." (Doc. No. 15-at 11.)

In opposition, plaintiffs argue that "[w]hile the Pacific West Region Directive PW-062 vests discretion with the park superintendent to develop and administer a hazard tree management program," the government "failed with to comply with Yosemite National Park Directive #25, the Hazard Tree Management Plan, it implemented." (Doc. No. 17 at 4.) Plaintiffs point out that section 6.E of Directive No. 25 emphasizes that "[w]hatever type of survey/inspection is accomplished, it is imperative that written documentation of the inspection be kept," while section 6.G. advises that

> A park hazard tree management program must include a monitoring component to perform follow-up surveillance/examination of previously examined trees rated medium/moderate or above; to follow-up on abatement/mitigation actions; to review the status of any park closures; and to track the numbers of trees lost per acre due to abatement/mitigation actions.

/////

7

(*Id.* at 4–5; *see also* Doc. No. 15-5 at 8.) Plaintiffs note that the government's exhibits comprise copies of tree inspection and treatment reports from the 2016 and 2017 fiscal years, but those documents only list tree inspections for dead trees that had been removed by the government at the time of the inspection. (Doc. No. 17 at 5.) Plaintiffs assert that based on NPS's tree hazard rating system, the Subject Tree's condition on the day of the incident warranted monitoring or management action. (*Id.*)

In reply, the government contends that plaintiffs' argument necessarily and erroneously presumes a mandatory duty to inspect the Subject Tree. (Doc. No. 19 at 2.) The government argues that NPS was neither required to inspect the Subject Tree nor required to survey the relevant portion of Big Oak Flat Road. (*Id.* at 3.) Further, the government argues that even if NPS was required to take some action at some point with respect to the Subject Tree, nothing required the agency to act before September 3, 2017, or to take measures that necessarily would have prevented the incident that occurred here. (*Id.* at 3–4.)

The court is persuaded by the government's argument. The decision in *Kim v. United States* is instructive here. There, plaintiffs were the parents of one of two teenaged boys who sustained fatal injuries when struck by a limb that fell from a California black oak in Yosemite. *Kim I*, 2017 WL 2619129, at *1. Plaintiffs brought claims for wrongful death and negligent infliction of emotional distress against the United States, "alleging that Defendant was negligent in maintaining the Subject Tree and the area around it, and that Defendant knew or should have known of a defect in the tree." *Id.* When the discretionary function exception was invoked, plaintiffs "argue[d] that the statement in Directive # 25 that '[t]rees with a high or very high hazard rating will require some type of abatement/mitigation' establishes that some response is mandatory once a sufficiently severe tree hazard is identified." *Id.* at *6. In other words, plaintiffs' position was "that Defendant may not 'ignore visible hazards that pose a risk to human lives.'" *Id.* In finding that the government met its burden at step one if the *Berkovitz* test, the district court noted that plaintiffs "ha[d] not offered any evidence that Defendant in fact rated or should have rated the Subject Tree as a high or very high hazard." *Id.* Moreover, the court

/////

reiterated that "[a]t step one of the discretionary-function-exception analysis, all that matters is that there was, in fact, discretion." *Id.* (internal citation and quotation marks omitted).

After the government filed its motion to dismiss in this action, the Ninth Circuit decided the appeal in the *Kim* case. *See Kim v. United States*, 940 F.3d 484 (9th Cir. 2019) ("*Kim II*").[3] In addressing step one of the *Berkovitz* test, the Ninth Circuit in *Kim II* declined to "decide whether the government is right about the nature of its supposed discretion over which areas to inspect, because any such discretion is beside the point in this case." *Id.* at 488.  The government had admitted to inspecting the campground in each of the two years prior to the accident, identifying and abating hundreds of hazard trees but not identifying the subject tree as hazardous. *Id.* Accordingly, the Ninth Circuit left unresolved the question that is presently before this court. *See id.* ("Regardless of whether the discretionary function exception might apply to some hypothetical decision *not* to inspect the campground, here we must decide whether Park officials are shielded from liability for their conduct in actually inspecting that area once they undertook to do so.").[4]

Here, the government argues that *Kim II* is inapplicable because the evidence establishes that the Subject Tree was not inspected and NPS did not employ its tree hazard rating system to it. (Doc. No. 19 at 4.) The court agrees. *See Lam v. United States*, 979 F.3d 665, 678 (9th Cir. 2020) (*Kim II* "turned on Directive 25, part of Yosemite National Park policies. And as the panel explained, once the Park officials undertook to inspect the trees in the park, they had to follow the established policies.") (internal citations omitted); *Garcia v. United States*, No. 20-cv-00220-PHX-MTL, 2021 WL 1056294, at *6 (D. Ariz. Mar. 18, 2021) (distinguishing *Kim II* while noting that "[a]s the court in *Lam* recognized, when the government is balancing multiple policy-

---

[3] After the district court dismissed the original complaint in *Kim I*, the plaintiffs filed an amended complaint. *Kim II*, 940 F.3d at 486–87. Subsequently, the district court dismissed the amended complaint without leave to amend, and plaintiffs timely appealed. *Id.* at 487.

[4] Notably, the plaintiffs in *Kim* had "separately alleged that Park officials *in fact* knew" of the danger posed by the subject tree in that case because the subject tree "had similarly broken in the past and had begun to bow noticeably above the campsite in question." 940 F. 3d at 490. In the complaint in this case, plaintiffs have advanced no similar allegations.

9

driven factors without a specific system in place to instruct its decision-making process, the government will be protected by the discretionary function exception").

Most importantly in this case, plaintiffs have not alleged that the government inspected the Subject Tree and failed to document or monitor it properly. Rather, in opposing the pending motion to dismiss, plaintiffs merely argued that the government failed to document all of the trees it inspected. (*See* Doc. No. 17 at 5) ("Defendant failed to document the inspections that were conducted and instead only documented the trees that were removed," and "[h]ad Defendant documented the full extent of the trees inspected, it would have been aware of the dead [Subject Tree]."). The government asserts that the Subject Tree was not documented because the portion of Big Oak Flat Road where the Subject Tree was situated was not surveyed. (Doc. No. 19 at 2.) This is corroborated by the declaration of Gene Smith, Roads and Trails Facility Manager at Yosemite. (*See* Doc. No. 19-1 at ¶ 4) ("During 2016 and 2017, the supervisory employees overseeing forestry district operations exercised their discretion to survey and treat certain portions of Big Oak Flat Road, but not the area where the tree failure occurred on September 3, 2017.").

At the hearing on the pending motion, plaintiffs conceded that their claim would be barred by the discretionary function doctrine if the Subject Tree was never inspected. However, plaintiffs observe that the relevant documents fail to establish that the Subject Tree was *not* inspected. (*See* Doc. No. 15-13.) Plaintiffs also argue that the government had a duty to monitor trees that were not being inspected, and no documentation before the court shows that the Subject Tree was being monitored. Nonetheless, plaintiffs have pointed to no policy stating that trees that have not been inspected must be monitored. As noted, plaintiffs assert that the government only documented the trees that were removed. But they also concede that there is apparently no applicable monitoring policy and also admit that they cannot confirm whether the Subject Tree was inspected at some prior time or was monitored. In sum, plaintiffs have not identified a "specific mandatory tree hazard management protocol which displaces the element of discretion afforded to the National Park Service in Yosemite" with respect to the Subject Tree. *Kim I*, 2017 WL 2619129, at *7.

Accordingly, the court concludes that the government has satisfied the first step of the *Berkovitz* test for application of the discretionary function exception.

**B.     NPS's Tree Management is Susceptible to Policy Analysis.**

At step two of the *Berkovitz* test, the key inquiry is whether the decision giving rise to tort liability is "susceptible to a policy analysis." *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998); *see also Gaubert*, 499 U.S. at 325 (emphasizing that the focus is "on the nature of the actions taken" rather than on the agent's subjective intent); *Chadd*, 794 F.3d at 1109 (noting that the exception is not confined to the policy or planning level).  If the relevant rule gives government employees discretion under *Berkovitz* at step one of the analysis, there is "a strong presumption" that the authorized conduct involves consideration of public policy under *Berkovitz* at step two of that analysis.  *See Chadd*, 794 F.3d at 1109.  Plaintiff "'must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.'"  *Id.* (quoting *Gaubert*, 499 U.S. at 324–25).[5]

---

[5]  It has been held that the challenged government decision need not actually have been grounded in policy considerations to satisfy the second step of the *Berkovitz* test, so long as the decision theoretically implicates policy concerns.  *See e.g.*, *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998) (the challenged decision "need not be actually grounded in policy considerations"); *Gibson v. United States*, 809 F.3d 807, 813 (5th Cir. 2016) (the inquiry is "not whether the decision maker in fact engaged in a policy analysis"); *Herden v. United States*, 726 F.3d 1042, 1047 (8th Cir. 2013) ("[T]he [discretionary function] exception applies 'whether or not [a] defendant in fact engaged in conscious policy-balancing.") (*en banc*) (quoting *C.R.S. ex rel. D.B.S. v. United States*, 11 F.3d 791, 801 (8th Cir. 1993)); *Cranford v. United States*, 466 F.3d 955, 955 (11th Cir. 2006) (the discretionary function exception analysis does not focus "on whether the agent actually weighed policy considerations"); *Smith v. Washington Metropolitan Area Transit Authority*, 290 F.3d 201, 214 (4th Cir. 2002) (the exception can apply "without any showing that its employees actually considered policy goals in making the decisions alleged to be negligent.").  The Supreme Court, however, has never stated that the exception applies to government conduct not actually rooted in policy considerations.  *See generally Gaubert*, 499 U.S. at 323 ("[T]he exception protects only government actions and decisions based on considerations of public policy.").  For this reason, the Ninth Circuit's decision in *Miller*, and those like it, have been subject to some criticism.  *See Chadd v. United States*, 794 F.3d 1104, 1114 (9th Cir. 2015) (Berzon, concurring) (criticizing the holding in *Miller* that the challenged decision need not be actually grounded in policy considerations and observing "that is not what *Gaubert* says—it says the opposite.")  According to Judge Berzon's concurring opinion in *Chadd*, "the proper rule is this:  In every case, the relevant decision does need to be 'actually grounded in policy considerations,' but, as a practical and evidentiary matter, the fact that a decision is 'susceptible to a policy analysis' creates a strong presumption that it was actually made for policy reasons, rebuttable only by persuasive evidence to the contrary." *Chadd*, 794 F.3d at 1114; *see also Gonzalez v. United States*, 814 F.3d 1022, 1040-43 & n. 2 (9th Cir. 2015) (Berzon, dissenting).  However, *Miller* remains the controlling Ninth Circuit precedent and is binding on this court.  *See Chadd*, 794 F.3d at 1114.

In applying the second step of the *Berkovitz* analysis, the Ninth Circuit has identified certain governmental decisions that are not of the kind that the discretionary function exception was designed to shield. For example, that court has observed that "actions based on technical or scientific standards" are generally not protected from liability by the discretionary function exception. *Marlys Bear Medicine v. U.S. ex rel. Secretary of Dep't of Interior*, 241 F.3d 1208, 1214 (9th Cir. 2001). Likewise, actions implementing prior policy decisions have been found not to be susceptible to policy analysis, absent evidence to the contrary. *Whisnant v. United States*, 400 F.3d 1177, 1183 n.3 (9th Cir. 2005); *see also Summers v. United States*, 905 F.2d 1212, 1216 (9th Cir. 1990) ("[L]iability for negligence may be imposed where, as here, the governmental decision involved is found not to be grounded in economic, political, or social judgment."); *Gotha v. United States*, 115 F.3d 176, 181–82 (3d Cir. 1997) (observing that the discretionary function exception is not meant to apply to "mundane, administrative, garden-variety housekeeping problem[s]"). *But cf. Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995) (cautioning against an excessive focus on the distinction between implementation or execution of policy decisions, and emphasizing that the critical inquiry is "[w]hether the nature of the decision involved the exercise of policy judgment").

Here, the government argues that resolution of the pending motion "turns on whether and how often trees should be surveyed, the locations and manner in which surveys occur, as well as when and how to abate or mitigate hazards, whether by removing or modifying trees, neutralizing targets, or providing warnings." (Doc. No. 15-1 at 12) (internal citations omitted). The government also argues that this case "implicates whether and under what circumstances the agency should prioritize other policy goals, such as resource conservation and budgeting and staffing." (*Id.*) Declarant Mattos points to the 1993 Guidelines (Doc. No. 15-6) as evincing NPS's "decision-making challenge" when considering tree removal: a balancing act of factors such as "visitor experience and safety, . . . effects on rare and endangered species on their critical habitat, impacts to visual resources or cultural landscape values, impacts to soils and hydrology, significant alteration of local natural forest structure and composition, and wildlife nesting or breading periods." (Doc. No. 15-2 at ¶ 24.) Declarant Mattos also points to the NPS Policies of

2006 and Directive PWR-062, which this court has previously found to "reference the medley of policy considerations implicated in tree hazard management decisions of the NPS." *Kobi*, 2016 WL 6599748, at *6.  Lastly, Mattos notes that Directive No. 25 "reiterates the policies set forth in Directive PWR-062" and gives the park superintendent discretion to administer the program with park staff and financial resources in mind.  (Doc. No. 15-2 at ¶ 22.)  Notably, plaintiffs' opposition brief does not address step two of the *Berkovitz* test.

The court concludes that the specific tree management decisions challenged by plaintiffs in their claim are susceptible to policy analysis.  The government has presented abundant evidence indicating that tree management decisions in Yosemite implicate larger concerns—economic considerations, employee safety concerns, cultural considerations, and environmental interests.  *Kobi*, 2016 WL 6599748, at *6.  As the Smith Declaration explains,

> Given the unprecedented tree mortality in Yosemite during 2016 and 2017, and given the finite resources allocated to forestry district operations, tree surveys and treatment in Yosemite has focused on campgrounds, picnic areas, and other "high" rated targets as a priority vis-à-vis "medium" or "low" rated targets, such as roads. . . . [T]he supervisory employees . . . exercised their discretion to survey and treat certain portions of Big Oak Flat Road, but not the area where the tree failure occurred on September 3, 2017.

(Doc. No. 19-1 at ¶ 3.)  The allocation of finite resources is a policy judgment the Ninth Circuit has long held to be protected under the discretionary-function exception.  *See Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995).  For these reasons, the court concludes that the government has also satisfied the second step of the *Berkovitz* test with respect to plaintiffs' negligent maintenance claim, and that the discretionary function exception therefore applies here.  *See Valdez*, 56 F.3d at 1179–80 (concluding that NPS decisions concerning national park trail maintenance "clearly implicate[] a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards").

Accordingly, the government's motion to dismiss plaintiffs' negligent maintenance claim for lack of subject matter jurisdiction will be granted.  As noted above, plaintiffs have conceded that it does not appear that there is any applicable monitoring policy if the Subject Tree was not

inspected, and they have no way of confirming whether the Subject Tree was inspected at some prior time or was monitored.  Indeed, it is likely that plaintiffs' claim would also fall outside of the discretionary function exception if NPS *had* inspected the Subject Tree.  *See Kim II*, 940 F.3d at 490 (holding that Park officials employing Directive No. 25's tree hazard rating system *after* identifying a hazardous tree requires scientific and professional judgment and therefore is not exempt from the scope of the FTCA).  Nonetheless, in light of plaintiffs' concession in this regard, there are no additional facts that plaintiffs can allege to state a claim that facially falls outside the discretionary function exception.  *See A.M. v. United States*, No. 19-cv-1108 TWR-AGS, 2020 WL 6276021, at *4 (S.D. Cal. Oct. 23, 2020) ("To defeat a motion to dismiss, plaintiffs must advance a claim that is facially outside the discretionary function exception.") (citing *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992)).  Because no amendment could change the outcome, granting leave to amend here would be futile.  Plaintiffs' complaint will therefore be dismissed without leave to amend and with prejudice.

## CONCLUSION

For all of the reasons set forth above:

1. Defendant's motion to dismiss (Doc. No. 15) is granted;
2. Plaintiffs' complaint (Doc. No. 1) is dismissed without leave to amend and with prejudice;
3. All previously scheduled dates in this action are vacated; and
4. The Clerk of the Court is directed to close this action.

IT IS SO ORDERED.

Dated:  **March 23, 2021**

UNITED STATES DISTRICT JUDGE

14